2020 UT App 67

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JUSTIN DAVID WILLIAMS,
Appellant.

Opinion
No. 20180649-CA
Filed April 23, 2020

Third District Court, West Jordan Department
The Honorable William K. Kendall
No. 181400273

Wendy Brown and Kimberly A. Clark, Attorneys
for Appellant

Sean D. Reyes and Marian Decker, Attorneys
for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN FORSTER and KATE APPLEBY
concurred.

HAGEN, Judge:

¶1 A jury convicted Justin David Williams of aggravated burglary, criminal mischief, and assault after he broke down the door to his father's motor home, entered, and attacked his father and brother. Williams appeals his conviction, arguing that the district court erred in admitting a nine-minute 911 call his father made after the assault. We conclude that the admission of the 911 call did not violate Williams's Sixth Amendment right under the Confrontation Clause because the call was not testimonial in nature. We further conclude that the district court properly relied on the excited utterance exception to the hearsay rule in admitting the statements made by the father at the outset of the

call and that Williams waived any error when he abandoned his request to redact the remainder of the recording. Accordingly, we affirm.

BACKGROUND[1]

¶2 On the night of January 10, 2018, Williams spotted his father's motor home parked outside a business in Midvale, Utah. He broke down the door, entered, and assaulted his father and brother. After Williams fled, the father called 911 and reported the assault.

¶3 At the outset of the call, the father's tone was distressed and his breathing labored:

> Q. This is 911. What is [inaudible]
>
> A. All right. Like, 72 South State, in a motor home parked in a parking lot.
>
> Q. In what city?
>
> A. Uh, Magna. I mean, not -- Midvale.
>
> Q. Okay. I'm sorry. Did you say this was a house, apartment or business?

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Ramirez*, 2019 UT App 196, n.2, 455 P.3d 1082 (cleaned up), *petition for cert. filed*, Jan. 16, 2020 (No. 20200055).

A. No, it's -- it's a -- it's a motor home that's parked on State Street. We just got assaulted --

Q. Okay.

A. -- by my son. I mean, we're -- we're hurting man. He tore the door down. He -- he's a fucking danger. Wow, fuck.

Q. And it's the parking lot of -- of what, sorry?

A. Po Boyz Karpet. It's right across from [inaudible] State Street and 70 -- 76 [inaudible] right by Pablo's Auto.

Q. [inaudible] phone number you're calling from?

A. Uh, [redacted]. Fuck. Oh, man.

Q. [inaudible] what's your name?

A. [redacted]. Oh, man.

Q. Did you say it was -- you said it was Pablo's Auto Loan that you're in the parking lot of?

A. No, no, no. I'm in the parking lot at Po Boyz Karpet. Okay? I'm in a motor home parked in the parking lot. [inaudible] the landlord said I could stay here for a couple more days. And the motor home is parked on the side in a parking lot. We've just been assaulted. Oh, fuck.

Q. [redacted], tell me exactly what happened.

A. He just -- he broke down the door and broke in. I guess he must have seen our motor home on the

side of the road. He got in the door [inaudible] tore the door right off. Fuck.

Q. Do you need medical attention?

A. Yes, I do. I got injuries. He kicked the shit out of both of us. Man [inaudible] is there somebody on their way?

Q. [inaudible] stay on the line while I update the officers.

¶4    At this point, a Unified Police dispatcher (the second dispatcher) joined the call and the first dispatcher explained the nature of the emergency. When the father spoke again, his voice had calmed. The second dispatcher asked the father a series of questions about the father's age and injuries, details of the assault, Williams's name and birthdate, Williams's physical description, the direction Williams was going when he left the scene, and whether drugs or alcohol were involved. By the end of the nearly nine-minute call, officers had arrived at the scene.

¶5    At trial, the State presented limited evidence. The State relied primarily on the 911 call to establish the course of events and the elements of the crimes charged. Neither the father nor the brother was available to testify at trial. In addition to the 911 recording, the State presented three witnesses: the second dispatcher, a dispatch records custodian, and a responding police officer. The State also presented photographs taken at the scene that showed the motor home and the father's injuries, along with the birth certificates of the father, brother, and Williams, which were used to establish their identities.

¶6    Before trial, the State filed a motion to admit the 911 phone call. Williams opposed the motion, arguing first, that it was inadmissible hearsay and second, that its admission would violate the Sixth Amendment's Confrontation Clause if the

father did not testify at trial. The State responded that the statements made during the phone call were nontestimonial, and that the call's admission therefore did not violate the Confrontation Clause. Further, it argued that although the call was hearsay, it fell under the excited utterance exception found in rule 803(2) of the Utah Rules of Evidence.

¶7     Before the start of trial, the district court heard arguments on the 911 call's admissibility. The court ruled that the entirety of the call was nontestimonial because the statements were elicited for the purpose of ending an emergency situation, and therefore its admission did not violate Williams's Sixth Amendment confrontation right. The court appeared less certain, however, as to whether the entirety of the call qualified as an excited utterance. During the court's discussion of the Confrontation Clause issue, it acknowledged that there was a point in the call where the father's breathing slowed down and the type of information being relayed was not "of the nature and character of the initial information." When defense counsel argued that parts of the call should be redacted because of this, the court responded, "I think we can cross that bridge if we get there."

¶8     And the district court did eventually get there, ruling that the call was admissible as an excited utterance under rule 803(2) of the Utah Rules of Evidence. At that point, defense counsel stated, "Your Honor, the redaction portions." The court responded, asking, "[S]o you're . . . asking to stop the call, I guess, at the further questioning, in terms of the description of the son and where he went?" But defense counsel replied, "No, more [that] he's . . . dangerous when he's on drugs." The court noted that the father never made this statement during the phone call, and moved on.

¶9     At trial, the State played the entire phone call for the jury. The jury convicted Williams of aggravated burglary, a first

degree felony; criminal mischief, a class B misdemeanor; and assault, a class B misdemeanor. Williams appeals.

## ISSUES AND STANDARDS OF REVIEW

¶10   Williams argues that the admission of the 911 call constitutes reversible error for two reasons. First, he contends that its admission violated his right to confrontation under the Sixth Amendment. "Whether a defendant's confrontation rights have been violated is a question of law, reviewed for correctness." *State v. Garrido*, 2013 UT App 245, ¶ 9, 314 P.3d 1014. Second, he contends that the 911 call was not admissible under the excited utterance exception to the hearsay rule. "In reviewing the admissibility of hearsay, legal conclusions are reviewed for correctness, factual determinations are reviewed for clear error, and the ultimate question of admissibility is reviewed for abuse of discretion." *State v. C.D.L.*, 2011 UT App 55, ¶ 29, 250 P.3d 69.

## ANALYSIS

¶11   For a hearsay statement to be admissible in a criminal trial, it must clear two hurdles. First, its admission must not violate the defendant's Sixth Amendment right to confrontation. Second, it must be admissible under an exception to the rule against hearsay. We address both points, beginning with the Confrontation Clause.

### I. The Confrontation Clause

¶12   The Sixth Amendment states that "the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "When out-of-court testimonial statements . . . are offered against a defendant at trial, the Confrontation Clause demands what the common law required:

unavailability and a prior opportunity for cross-examination." *West Valley City v. Kent*, 2016 UT App 8, ¶ 13, 366 P.3d 415 (quoting *Crawford v. Washington*, 541 U.S. 36, 68 (2004) (cleaned up)). On the other hand, hearsay statements that are nontestimonial do not implicate the Confrontation Clause. *See State v. Griffin*, 2016 UT 33, ¶ 35, 384 P.3d 186.

¶13 The United States Supreme Court in *Davis v. Washington*, 547 U.S. 813 (2006), described the difference between testimonial and nontestimonial statements in the context of questioning by police officers:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822.

¶14 In *Davis*, a victim of domestic violence called 911 to report that her former boyfriend had assaulted her and then fled from her house. *Id.* at 817–18. The conversation between the emergency operator and the victim included the following statements:

> 911 Operator: What's going on?
>
> Complainant: He's here jumpin' on me again.
>
> 911 Operator: Okay . . . Are you in a house or an apartment?

Complainant: I'm in a house.

911 Operator: Are there any weapons?

Complainant: No. He's usin' his fists.

911 Operator: Okay. Has he been drinking?

Complainant: No.

. . . .

911 Operator: Listen to me carefully. Do you know his last name?

Complainant: It's Davis.

911 Operator: Davis? Okay, what's his first name?

Complainant: Adrian.

. . . .

911 Operator: Okay. What's his middle initial?

Complainant: Martell. He's runnin' now."

*Id.* at 817–18.

¶15    The Court held that the victim's statements on the 911 recording were nontestimonial and therefore their admission did not violate the Sixth Amendment even though the defendant was unable to confront the victim declarant. *Id.* at 828. Specifically, the Court noted that the questions and answers heard in the call were "necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past." *Id.* at 827. The Court held that even the statements identifying the assailant were nontestimonial because the

dispatcher asked for the assailant's full name "so that the dispatched officers might know whether they would be encountering a violent felon." *Id.*

¶16  Here, the district court correctly held that the primary purpose of the father's phone call was to enable police assistance to meet the ongoing emergency and that the questions from dispatch were "designed to resolve the ongoing situation, to allow police and paramedics to respond." The father called to report that he and the brother had "been assaulted," and were "hurting." Other information provided to the dispatchers, such as Williams's birthdate, his description, the direction he was heading, and whether he had a weapon, all provided the police with information necessary to provide assistance to the father and to locate the suspected assailant. As the district court recognized, "in order to end the threatening situation, police need to know who they're looking for." These statements are precisely the type of statements the *Davis* Court held were nontestimonial.

¶17  The father's statements are distinguishable from testimonial statements given to police for the primary purpose of investigating a crime. For example, in *Hammon v. Indiana*, 547 U.S. 813 (2006) (the companion case to *Davis v. Washington*), where the victim declarant's statements were made during a police interview after the violent situation had subsided and the attacker had been located, the Court held that the interview's primary purpose was gathering information, rather than responding to an ongoing situation. *Id.* at 829–30. The declarant in *Hammon* "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed," and the questioning "took place some time after the events described were over." *Id.* at 830. Further, the officer questioned the declarant in a separate room, away from her attacker. *Id.* Under these circumstances, the Court held that the statements were testimonial because their primary purpose was

to provide information relevant to the investigation, rather than information needed to respond to an ongoing situation. *Id.* at 829–30.

¶18 In contrast, the father's statements in this case were not made for the primary purpose of facilitating an investigation of a crime, but instead to enable the police to adequately respond to the scene. The father did not call 911 to report information about a completed crime after the situation was resolved. Rather, he was in an unsafe environment and seeking medical attention and protection. Unlike in *Hammon*, nothing separated the father from Williams. According to the father, Williams was still at large and potentially carrying a weapon, and the injured father remained in a public parking lot at night in a motor home without a door.

¶19 For these reasons, we agree with the district court that the primary purpose of the 911 call was to enable police assistance to meet an ongoing emergency. Therefore, Williams's Sixth Amendment right to confrontation was not violated when the call was admitted into evidence.

## II. Excited Utterance

¶20 Although the statements in the 911 call did not implicate Williams's Sixth Amendment right to confrontation, the recording must still be admissible under the Utah Rules of Evidence. *See Salt Lake City v. Williams*, 2005 UT App 493, ¶¶ 25–26, 128 P.3d 47. Williams raised a hearsay objection below, but the district court ruled that the call was admissible under the excited utterance exception in rule 803(2) of the Utah Rules of Evidence. We agree that at least some of the statements during the call were admissible as excited utterances.

¶21 Rule 803(2) defines an excited utterance as a "statement relating to a startling event or condition, made while the

declarant was under the stress of excitement that it caused." Utah R. Evid. 803(2). To be admissible under the excited utterance exception, three factors must be met: "(1) a startling event or condition occurred, (2) the statement was made while the declarant was under the stress of excitement caused by the event or condition, and (3) the statement relates to the startling event or condition." *West Valley City v. Hutto*, 2000 UT App 188, ¶ 15, 5 P.3d 1 (cleaned up).

¶22　The district court found that all three factors were met. As to the first and third factors, the court explained that Williams appearing at his father's motor home unexpectedly, breaking down the door, and assaulting the father and brother constituted "a startling event or condition" and that "all the information given related to the startling event or condition." Because we review the district court's factual findings for clear error, we will set aside those findings only if they are "against the clear weight of the evidence, or if we otherwise reach a definite and firm conviction that a mistake has been made." *Brown v. State*, 2013 UT 42, ¶ 37, 308 P.3d 486 (cleaned up).

¶23　The district court's factual findings on the first factor—that a startling event occurred—were fully supported by the evidence. In the phone call, the father explained that Williams must have spotted his parked motor home from the road. Williams then "got in the door . . . tore the door right off," "kicked the shit out of" the father and brother, and that they were "just trying to survive." The father stated he was injured and bleeding. Photographs admitted into evidence, along with testimony from one of the responding officers, confirm that the father was bleeding from injuries on his face and head. This evidence also supports the court's finding that the father's statements related to the startling event or condition, satisfying the third factor. All the information relayed during the phone call related to the reported assault, including the location and nature of the assault and the description of the fleeing assailant.

Given these supported factual findings, the district court did not exceed its discretion in ruling that the first and third factors were met.

¶24 The second factor, however, is typically "the most difficult issue in determining the admissibility of an excited utterance." *State v. Smith*, 909 P.2d 236, 240 (Utah 1995). This factor requires that the declarant be under the stress of the startling event when the statement is made. *Hutto*, 2000 UT App 188, ¶ 15. "The generally accepted rationale for the exception is that declarations made during a state of excitement temporarily still a declarant's capacity to reflect and thereby produce utterances free of conscious fabrication." *State v. Fahina*, 2017 UT App 111, ¶ 25, 400 P.3d 1177. For this factor to be met, the statement "must be a spontaneous reaction to the event or condition, not the result of reflective thought." *Smith*, 909 P.2d at 239. The ultimate determination is "whether the state of the declarant's mind was such that because of a high degree of emotional arousal, the declaration was spontaneous in the sense that the declarant's emotional arousal or excitement at the time of the statement strongly suggested that the statement came purely from the declarant's memory, unchanged or distorted by a consideration of the consequences of the statement." *Id.* at 240.

¶25 The district court found that "based upon the statements, the specific words that were given, as well as the tone of the declarant's voice . . . the declarant was still under the stress . . . or excitement caused by the event or condition." However, "not every statement made by an excited person is an excited utterance for purposes of the hearsay rule." *Hutto*, 2000 UT App 188, ¶ 22. The court appears to have considered the phone call as a whole instead of examining the admissibility of "particularized utterances." *Id.* ¶ 14. The court focused on the tone of the father's voice and the words he used to determine that the father remained under the stress of the event during the entire call, instead of considering each statement individually.

¶26 Looking at each discrete statement in the call, we agree that the father's statements to the first dispatcher at the outset of the call were a "spontaneous reaction to the event or condition, not the result of reflective thought." *See Smith*, 909 P.2d at 239. In making this assessment, we look to a variety of factors, including:

> the declarant's age, elapse of time between event and statement, the nature of the event, the apparent emotional state and intensity of emotional reaction, hospitalization, whether the statement was spontaneous or in response to a question, and the declarant's familiarity with his or her surroundings.

*Hutto*, 2000 UT App 188, ¶ 16.

¶27 Although the declarant's age is not relevant in this case, each of the remaining factors supports the conclusion that each of the father's statements at the outset of the call were made under the stress of the startling event. First, minimal time had elapsed between the startling event and the statements made at the beginning of the call. The father reported that they had "just" been assaulted and the responding officer observed fresh injuries when he arrived at the scene minutes later. The record fully supported the district court's factual finding that the assault was "clearly a fresh event."

¶28 Next, the nature of the event was unexpected and traumatic. Based on the father's statements to dispatch, Williams arrived uninvited, having spotted his father's motor home parked outside a business on a busy street. Williams "tore the door right off" the motor home to get to his father and brother and "kicked the shit" out of both of them. According to the father, Williams "wrecked the place" and had been "kicking, slapping, [and] hitting [him] with stuff." The father reported that

he was "just trying to survive" and that he had injuries requiring medical attention. The responding officers documented the father's injuries and the father was later treated at the hospital.

¶29 In addition, the father's tone of voice, labored breathing, and spontaneous exclamations such as "we're hurting man" and "he's a fucking danger" reflect his "apparent emotional state and intensity of emotional reaction." *Id.* Many of the father's statements were spontaneous and not responsive to the dispatcher's questions. Even those that were responsive were "spontaneous in the sense that the declarant's emotional arousal or excitement at the time of the statement strongly suggested that the statement came purely from the declarant's memory, unchanged or distorted by a consideration of the consequences of the statement." *Smith*, 909 P.2d at 240.

¶30 Finally, although the father was in familiar surroundings, Williams had "wrecked" the place, he was still at large, and the father and brother had no protection from Williams if he had chosen to return. All of these factors support the conclusion that the father's statements at the outset of the call were a spontaneous reaction to the event or condition, rather than the result of reflective thought processes.

¶31 But once the second dispatcher joined the call, the father's voice calmed, his breathing slowed, and his answers to the dispatcher's questions became less spontaneous. He was able to respond appropriately to the dispatcher's questions and provide Williams's name, birthdate, ethnicity, and build, along with the direction Williams was heading and what he was wearing, evidencing reflective thought. Indeed, the district court recognized as much. While discussing the Confrontation Clause, the court stated that it thought "once they start giving some more information, you know, he left on foot. He left east. . . what was he wearing, what were his clothes, what's his . . . height, weight, those kinds of things . . . it certainly seems that . . . the

alleged victim's voice has calmed down at that point, and that's additional information that . . . maybe isn't of the nature and character of the initial information." Because the father's statements during the second part of the call do not qualify as excited utterances, those statements should have been excluded. However, we conclude that Williams waived his right to appeal this issue by deliberately abandoning any request to stop the call at that point.

¶32    Although "the terms 'waiver' and 'forfeiture' 'are often used interchangeably'" in Utah case law, "the two concepts are fundamentally different." *State v. Fuller*, 2014 UT 29 ¶ 28 n.21, 332 P.3d 937 (quoting *In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 51 n.1, 266 P.3d 702 (Lee, J., concurring)). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (cleaned up). "This distinction is important because a defendant is generally precluded from obtaining appellate review when he waives a right, but he may still obtain review for plain error when the right has only been forfeited." *Fuller*, 2014 UT 29, ¶ 28 n.21.

¶33    Invited error is "a species of waiver because it requires intentional relinquishment of a right." *United States v. Thornton*, 846 F.3d 1110, 1117 n.3 (10th Cir. 2017) (cleaned up); *see also Vaught v. State*, 366 P.3d 512, 520 (Wyo. 2016). Under well-established Utah case law, when a party invites an error in the district court, "we will not review it even for plain error." *State v. Popp*, 2019 UT App. 173, ¶ 23, 453 P.3d 657 (cleaned up); *see also State v. Winfield*, 2006 UT 4, ¶ 14, 128 P.3d 1171 (noting that "under the doctrine of invited error, we have declined to engage in even plain error review when counsel, either by statement or act, affirmatively represented to the trial court that he or she had no objection to the proceedings" (cleaned up)). The "invited error doctrine arises from the principle that a party cannot take advantage of an error committed at trial when that party led the

trial court into committing the error." *Pratt v. Nelson*, 2007 UT 41, ¶ 17, 164 P.3d 336 (cleaned up). It "discourages parties from intentionally misleading the trial court so as to preserve a hidden ground for reversal on appeal and gives the trial court the first opportunity to address the claim of error." *State v. McNeil*, 2016 UT 3, ¶ 17, 365 P.3d 699 (cleaned up).

¶34  Here, the State argues that any error in admitting the entire phone call was invited because defense counsel encouraged the court to make the erroneous ruling. The court specifically asked whether the defense was "asking to stop the call . . . at the further questioning, in terms of the description of the son and where he went?" But defense counsel replied, "*No, more [that] he's . . . dangerous when he's on drugs.*" (Emphasis added.) The court found that it could not make that redaction because the father never made such a statement during the call. Williams contends that, at most, he failed to properly preserve this issue by not asking for further redactions at that time and that we should still review this forfeited issue for plain error.

¶35  Unlike a typical case involving invited error, the record does not demonstrate "that counsel independently made a clear affirmative representation of the erroneous principle." *Id.* ¶ 18. That is, defense counsel never affirmatively proposed that the entire call be played for the jury. Nor did defense counsel suggest that if some of the statements constituted excited utterances the entire call was admissible. Instead, defense counsel originally objected to the admission of the entire call and argued, in the alternative, that parts of the call needed to be redacted. But when the district court asked if Williams wanted to "stop the call . . . at the further questioning," defense counsel responded, "No."

¶36  Even if Williams's response does not qualify as invited error, it constitutes something more than "mere silence," which would render the issue merely unpreserved and subject to plain

error review. *See id.* ¶ 21 n.2. Nor can it be characterized as "affirmative acquiescence" to the district court's ruling, as the court was inviting the very argument that Williams disavowed. *See id.* ¶ 21. In fact, the court appeared inclined to agree that the statements made after the second dispatcher joined the call were not admissible as excited utterances, but Williams repudiated the court's suggestion that he was asking to "stop the call . . . at the further questioning." At minimum, Williams intentionally relinquished or abandoned any request to redact the statements made after the second dispatcher joined the call. *See United States v. Carrasco-Salazar*, 494 F.3d 1270, 1272–73 (10th Cir. 2007) (joining other courts that "have uniformly held that an abandoned objection is waived").

¶37 Although Williams initially objected to the admission of the entire call, when the court gave him the opportunity to argue for redaction, he abandoned that objection. Because Williams waived this error, he is now precluded from challenging it on appeal. *See Fuller*, 2014 UT 29, ¶ 28 n.21.

CONCLUSION

¶38 We conclude that the admission of the 911 call did not violate Williams's Sixth Amendment right to confrontation because the call was nontestimonial in nature. We also conclude that the first part of the call was properly admitted as an excited utterance and that Williams waived any error in admitting the entire call. Accordingly, we affirm.

————————