**2025 UT App 125**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
SHANEAN MARQUIS GILLING,
Appellant.

Opinion
No. 20230632-CA
Filed August 21, 2025

Second District Court, Farmington Department
The Honorable David J. Williams
No. 221701190

Freyja Johnson and Hannah Leavitt-Howell,
Attorneys for Appellant

Derek E. Brown and Daniel W. Boyer,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN D. TENNEY concurred.

OLIVER, Judge:

¶1     A jury convicted Shanean Marquis Gilling of two counts of object rape. He now appeals, arguing that the trial court abused its discretion in allowing certain expert testimony and in prohibiting Gilling from calling alibi witnesses. In the alternative, he argues that his counsel provided constitutionally ineffective assistance. He has also filed a motion for remand under rule 23B of the Utah Rules of Appellate Procedure related to one of his alibi witnesses. We reject Gilling's claims of error and ineffective assistance of counsel, deny his rule 23B motion, and affirm his convictions.

## BACKGROUND[1]

### *The Incidents*

¶2    Marsha[2] met Gilling through her brother and her ex-boyfriend. After going through a tough time in her personal life, Marsha began to use methamphetamine to cope with the trauma she had experienced. Knowing that Gilling supplied her brother with drugs, she began to buy drugs from him as well. Over the years, they also developed a friendship.

¶3    When Gilling needed a place to stay, Marsha would let him stay at her house on a temporary basis, and, in exchange, Gilling would supply her with drugs. Gilling would typically let Marsha know when he was coming over to stay, but sometimes he would just show up at her house. Marsha never had a romantic relationship with Gilling.

¶4    Eventually, Marsha "got sober and started a new life." Around this time, she also began dating someone (Boyfriend). Unfortunately, Marsha relapsed in April 2021. She "took a few days off of work to be able to come down to get sober" and "try to stay straight." When coming down from drugs, Marsha slept "really heavy," became emotional, ate a lot, and needed to rest. Knowing she would require time alone, she told Gilling she was getting sober and "needed some space" and told him not to come around for a few days." She also told him that Boyfriend would take care of her.

---

1. "In an appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Kufrin*, 2024 UT App 86, n.1, 551 P.3d 416 (cleaned up).

2. A pseudonym.

¶5    On April 11, 2021, Marsha was "sleeping really heavily" and having "vivid dreams" that "got really weird." When she awoke, she found Gilling "on top of [her] with his fingers inserted inside of [her]" vagina, moving them "in and out." He was "dry humping [her] leg, . . . kissing [her] neck," and "moving his body." Though she had fallen asleep wearing clothes, her pants had been "pulled down to about [her] mid thighs." She said to Gilling, "Whoa. Whoa. Whoa. Get off me," as she "pulled up [her] pants and scooted away" from him. Gilling said, "I thought you wanted this," to which Marsha replied, "No hard feelings." Gilling left, and Marsha tried to call Boyfriend. When she could not reach him, she went back to sleep.

¶6    Marsha's sleep was not restful. She cried frequently, had nightmares and night sweats, and woke up regularly. She slept in this way for around thirty-six hours. After that, Marsha ate, watched some TV, and tried to reach Boyfriend again before going back to sleep. When she woke up, the same thing was happening again: Gilling on top of her, kissing her neck with his fingers inside of her vagina, and "dry humping" her leg. She woke up "feeling angrier that time." She pulled herself away and said, "You need to get off me." Gilling then left, and Marsha went to stay at Boyfriend's house.

*Marsha Tells Boyfriend and Reports the Incidents to Police*

¶7    Initially, Marsha did not tell anyone what happened because it "was hard to process . . . [and] traumatic." Eventually, on June 5, Marsha told Boyfriend what occurred. Boyfriend could "tell that she was upset" when she told him because she was "wringing her hands and crying."

¶8    The next day, Boyfriend and Marsha went to Marsha's house to get items she needed. When they arrived, Boyfriend saw the back door was open. They called the police. A police officer (Officer) spoke to Marsha over the phone. Marsha told Officer what Gilling had done to her, but explained she did not want to

press charges. She only wanted to have the incidents documented. Marsha also asked Officer if he could assist her in getting the items from her house because she was concerned Gilling would be there. So, Officer walked through her house with Boyfriend but found no one inside. Marsha gathered her belongings, and Officer took witness statements from them. Officer then gave Marsha a case number and informed her that if she decided she wanted to press charges, he would reactivate the case.

¶9     On September 9, 2021, Marsha again contacted the police because Gilling showed up at her house. Marsha expressed to Officer that she wanted to press charges because "she'd been thinking about it more and more" and decided to "just go for it." Officer reactivated the case and sent it to the investigations division. Shortly thereafter, a detective (Detective) interviewed Marsha.

¶10    In July 2022, Gilling was arrested and charged with one count of object rape occurring on or about April 11, 2021 and one count of object rape occurring on or about April 12, 2021.

*The Alibi Notice*

¶11    On April 16, 2023, eight days before trial, Gilling filed a notice of alibi (the Alibi Notice). The Alibi Notice listed six witnesses who would testify that Gilling was not in the house with Marsha on the dates and times of the alleged crimes. These witnesses included a defense investigator (Investigator), two friends that were with Gilling from April 9 to April 11, a friend who was with Gilling from April 11 to 13 "constantly because of [the friend's] medical situation," Marsha's employer, and Gilling himself.

¶12    At a hearing on the Alibi Notice, the State orally moved to exclude the alibi witnesses for failure to comply with the statutory requirements. *See* Utah Code § 77-14-2(1) (stating that notice is required "not less than 10 days before trial" and must include

"specific information as to the place where the defendant claims to have been at the time of the alleged offense"). The State argued that the notice was untimely because it was due on April 14, 2023, and that it was insufficient because it did not provide Gilling's location on the specific dates. Given the late notice and the number of witnesses, the State also did not believe it had "the ability to do all [the] independent research within a couple of days and . . . be prepared to cross-examine all of [the] witnesses."

¶13    Gilling's trial counsel (Counsel) argued that because the deadline was on Friday, the motion being filed on Sunday made it untimely only by one business day. Counsel emphasized that the State receiving the notice on Friday at 11:00 p.m. versus Sunday would likely not make much of a difference in the ability of the State to prepare to cross-examine these witnesses at trial. Counsel also asserted, twice, that "[p]art of the reason in the delay" in filing the Alibi Notice was that the State previously implied it was "not going to nail . . . down" specific dates and times as to when the alleged incidents occurred, so Counsel did not know what days to obtain alibi witnesses for. Counsel then reiterated that not knowing the dates "was a factor" in Counsel's delay. With respect to the Alibi Notice being insufficient, Counsel asserted that providing the specific locations of the witnesses was "less relevant" than the "individuals' statements of where they [were]." Counsel also expressed concern with the trial court making "the most drastic ruling, which would be to exclude" the alibi witnesses.

¶14    The trial court noted that the information listed "[p]retty specific dates" that the defense had "known since the Information was filed." The court then granted the State's motion because the Alibi Notice was untimely and failed to "contain specific information as to the place where the defendant claims to have been at the time of the alleged offense." The court indicated it would likely allow Investigator to "testify about some things"

depending on the direction his other testimony went and ruled that Gilling was "always available to testify on his own behalf regarding his alibi."

¶15 Counsel then asked the court to continue the trial rather than exclude the alibi testimony, which the State was open to considering. However, the trial court declined to grant a continuance because doing so would push the trial from April "out till probably November." And since the problem was not caused by the State, the court noted it would be unlikely to release Gilling from custody prior to trial.

*The Trial*

¶16 The State called Marsha, Boyfriend, Officer, and Detective, who testified to the facts as described above. The State also called a psychologist (Expert) who testified regarding how individuals respond to sexual violence, misconceptions about perpetrators, and the impact of trauma on the brain.

¶17 Expert further testified to the number of times he had seen false reports of sexual violence in his career. On cross-examination, Counsel asked Expert whether he had treated people in the past that Expert "knew or had strong concerns or suspicions" were making false allegations, to which Expert answered in the affirmative and spoke of two instances of false reporting he experienced in his career. Following this question, Counsel then asked Expert to clarify that in one of the instances, the individual "didn't actually say they made up the allegation," but "had other substantial life challenges that [Expert] was aware of that [Expert] thought increased the chance that the person was not being honest with [Expert] in that clinical setting." Expert confirmed this was accurate.

¶18 Then on redirect, the State asked Expert, "In your experience, and with the research, . . . is this idea of false allegations a common occurrence or an uncommon

occurrence?" Expert replied, "Very uncommon." Counsel objected on the grounds that the testimony "gets to probability." The trial court sustained the objection, and a bench conference was held.

¶19    During the bench conference, Counsel expressed concern that the jury would think false allegations "are rare," which in turn would "increase[] the likelihood that this one is unlikely." The State argued that by asking Expert whether he had seen false allegations in his career, Counsel "sort of [planted] in the jury's head that false allegations occur" and that the State should be able to clarify that impression. The court ultimately reaffirmed it was sustaining the objection. However, the court stated it would allow the State to ask "something like . . . you just testified in your clinical experience, you have been able to confirm that only one or two were false allegations. Out of how many?" and explained that it was allowing that line of questioning because Counsel "opened the door." Counsel agreed, stating, "I'm okay with that. . . . I think I've invited that."

¶20    Once the bench conference concluded, the State resumed its examination of Expert and the following exchange occurred:

> [The State]: You were asked about one or two specific occurrences in your practice where someone had . . . reported a false allegation of sexual assault. Is that a fair assessment?
>
> [Expert]: That's a summary, yes.
>
> [The State]: In your practice as a clinician, . . . how many other instances of false reports or false allegations have you experienced with your patients?

[Expert]: Those are the only two that come to mind specifically . . . . I would assume it may have happened one or two other times.

. . . .

[The State]: So we'll just go conservatively. Roughly four out of approximately a thousand?

[Expert]: Probably.

Expert further testified that substance abuse, hallucinations, and suggestibility could contribute to false memories or "memory error" but noted that he could not speak to the relationship between methamphetamine use and hallucinations caused by sleep deprivation as that was outside of his expertise.

¶21 After the State rested, Gilling called Investigator to testify on his behalf. Investigator testified to how sexual assault investigations work based on his experience as a former law enforcement officer.

¶22 In closing argument, the State emphasized Expert's testimony for the jury, stating,

[Expert] said in his 14 years as a clinician, that roughly two to four of them, approximately on a conservative note, out of a thousand sexual assault victims that he has helped . . . he's sort of gotten a feeling that maybe it was false . . . . And I think that . . . when you sort of put the numbers out there, it equates to less than one percent. I don't know exactly the number. But two to four out of approximately conservatively a thousand incidences in his direct experience.

And later, the State noted, "[I]t would be difficult to see someone subjecting themselves to this level of scrutiny. Getting here, testifying in a courtroom, if it was all just a fabrication. Which [Expert] testified doesn't happen very often." The State then "qualif[ied]" its statements, explaining that Expert testified to seeing false allegations infrequently in his clinical experience "in a therapy context, not a courtroom context . . . . Therapy context is different than courtroom context. [Expert] didn't [give] testimony regarding what happens in the courtroom."

¶23    Counsel discussed Expert's testimony as well. Counsel reiterated that Expert testified that false allegations "may be simple and without details" and that false allegations can also arise from false memories resulting from "trauma, substance abuse, and even hallucinations." Counsel argued that Marsha "[knew] that [Gilling] was a problem, that his relationship with her was toxic," and that for these reasons, Marsha "was trying to move on, and his presence was making that harder." Counsel also commented that Marsha "had suffered a traumatic life" that "involved addiction," which Gilling "bears some responsibility for."

¶24    Ultimately, the jury convicted Gilling on both counts of object rape. He was sentenced to five years to life on each count.

ISSUES AND STANDARDS OF REVIEW

¶25    Gilling raises several issues on appeal. He first argues that the trial court abused its discretion in permitting expert testimony that bolstered Marsha's credibility through anecdotal statistical evidence. "We review the admission of expert testimony under an abuse of discretion standard." *State v. Bowdrey*, 2024 UT App 113, ¶ 15, 555 P.3d 367 (cleaned up), *cert. denied*, 561 P.3d 688 (Utah 2024). In the alternative, he argues that Counsel was ineffective by opening the door to such testimony. "An ineffective assistance of counsel claim raised for the first time on appeal presents a

question of law, which we review for correctness." *State v. Whitchurch*, 2024 UT App 108, ¶ 30, 554 P.3d 1166 (cleaned up), *cert. denied*, 564 P.3d 960 (Utah 2025).

¶26 Gilling next asserts that the trial court abused its discretion in prohibiting Gilling from calling alibi witnesses. "A trial court's exclusion of an alibi witness because the defense had failed to timely notify the prosecution is reviewed for abuse of discretion." *State v. Tuinman*, 2023 UT App 83, ¶ 50, 535 P.3d 362 (cleaned up), *cert. denied*, 540 P.3d 79 (Utah 2023). In the alternative, he argues that Counsel was ineffective by failing to timely file the Alibi Notice, an issue which we review for correctness. *See Whitchurch*, 2024 UT App 108, ¶ 30.

¶27 Finally, Gilling filed a motion under rule 23B of the Utah Rules of Appellate Procedure requesting that this court remand the case to the trial court for further factual findings. A motion under rule 23B "will be available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a).

ANALYSIS

I. Anecdotal Statistical Evidence

¶28 Gilling asserts that Expert improperly bolstered Marsha's testimony by testifying "that in his clinical experience of having seen a thousand patients, he only believed two to have made false allegations." Gilling argues first that the trial court abused its discretion by allowing such testimony. And then, in the alternative, he argues that Counsel was ineffective for opening the door to the testimony. We conclude neither argument is availing.

A.    Abuse of Discretion

¶29    Gilling argues that the "trial court abused its discretion when it ruled that Expert could testify about the frequency of false allegations." In response, the State argues that Gilling waived this argument when he agreed with the trial court that he "invited" the specific line of questioning. We agree with the State.

¶30    During cross-examination, Counsel asked Expert whether he had treated people in the past that he "knew or had strong concerns or suspicions" were making false allegations, to which Expert answered in the affirmative and spoke to two instances of false reporting he experienced in his career. During redirect, the State asked Expert, "In your experience, and with the research, . . . is this idea of false allegations a common occurrence or an uncommon occurrence?" Counsel objected. The parties and the court then engaged in a discussion about the appropriate bookends for Expert's testimony. The trial court sustained the objection but stated that it would allow the State to ask Expert how many times he had seen false allegations throughout his career because Counsel had "opened the door." Counsel agreed that Expert could testify to his experience with the commonality of false allegations, stating, "I'm okay with that" and "I think I've invited that."

¶31    "A defendant is generally precluded from obtaining appellate review when he waives a right." *State v. Williams*, 2020 UT App 67, ¶ 32, 462 P.3d 832 (cleaned up). A waiver occurs when a defendant "intentional[ly] relinquish[es] or abandon[s] . . . a known right." *Id.* (cleaned up). Here, Counsel made an initial objection to the State asking Expert whether false accusations were common or uncommon, which the trial court ultimately sustained. But Counsel did not make an objection when the court proposed a question for the State to ask Expert regarding his experience with false allegations. Rather, Counsel stated, "I'm okay with that. . . . I think I've invited that." Counsel's statement

"was an affirmative representation to the [trial] court that . . . Counsel had no objection . . . . As such, the statement constituted a waiver of the issue and the invitation of any error resulting from the" court permitting the State to ask the question. *State v. Tafuna*, 2012 UT App 243, ¶ 15, 286 P.3d 340; *see also Williams*, 2020 UT App 67, ¶ 36 (concluding that the defendant waived an issue when he "intentionally relinquished or abandoned" his objection). This issue was therefore waived.

B.      Ineffective Assistance of Counsel

¶32     In the alternative, Gilling argues that he received ineffective assistance of counsel when Counsel "opened the door" to the State asking Expert questions about the frequency of false allegations and when Counsel admitted that he "invited that" line of questioning. To show that counsel did not provide effective assistance, a defendant must demonstrate both that "counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [Gilling's] claims under either prong." *State v. Popp*, 2019 UT App 173, ¶ 25, 453 P.3d 657 (cleaned up). We elect here to do so under the prejudice prong.

¶33     To show prejudice, Gilling must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. When we evaluate "a prejudice claim in the ineffective assistance context, we assess counterfactual scenarios—that is, what would have happened but for the ineffective assistance." *State v. Forbush*, 2024 UT App 11, ¶ 25, 544 P.3d 1 (cleaned up), *cert. denied*, 550 P.3d 995 (Utah 2024).

¶34     In the counterfactual scenario we must consider here, Counsel would not have asked about Expert's experience with false allegations, and the State would not have asked Expert to

quantify how many of his clients had made false allegations. But these questions were not uniformly harmful to Gilling. In fact, Counsel's questions helped further his defense that Marsha's allegations were false. In response to Counsel's question about whether Expert "knew or had strong concerns or suspicions" that clients of his were making false allegations, Expert responded that "substantial life challenges" can increase "the chance" that a person might make a false sexual assault allegation, and he discussed his experience with one such person. This testimony supported Gilling's defense that Marsha made up the allegations due to her "traumatic life" and that Gilling's presence "was making [it] harder" for her to "move on" from her drug "addiction." Eliminating these questions would also eliminate Expert's testimony supporting Counsel's assertion that due to her drug addiction, Marsha was lying about Gilling assaulting her.

¶35   We also think it noteworthy that, at trial, the State actively tried to mitigate Expert's testimony. The State initially said in closing that in Expert's fourteen years of experience, "roughly two to four of them, approximately on a conservative note, out of a thousand sexual assault victims that he has helped" may have made false allegations and that "when you sort of put the numbers out there, it equates to less than one percent." But shortly after making this statement, the State clarified that Expert was speaking to false allegations "in a therapy context, not a courtroom context . . . . Therapy context is different than courtroom context. [Expert] didn't [give] testimony regarding what happens in the courtroom." Because the impact of Expert's testimony was diminished by the State in its own closing statement, it is unlikely that Expert's testimony was the cornerstone of the jury's decision to convict Gilling. And where Expert's testimony on this issue was thus of limited significance, it is not likely that a trial without Expert's testimony would have resulted in a different outcome for Gilling.

¶36　For these reasons, Counsel's opening the door to Expert's testimony did not prejudice him. And since Counsel's opening the door arguably assisted Gilling's defense, it likewise was not prejudicial for Counsel to acknowledge that he did in fact open the door. Therefore, we conclude that Counsel was not ineffective.

## II. The Alibi Notice

¶37　Gilling asserts that the trial court abused its discretion when it prohibited him from calling his alibi witnesses. In the alternative, he argues that Counsel was ineffective for failing to timely file the Alibi Notice. We are not persuaded by either argument.

¶38　A defendant "shall, not less than 10 days before trial or at such other time as the court may allow, file and serve on the prosecuting attorney a notice, in writing, of the defendant's intention to claim alibi." Utah Code § 77-14-2(1).[3] The notice must "contain specific information as to the place where the defendant claims to have been at the time of the alleged offense and, as particularly as is known to the defendant or the defendant's attorney, the names and addresses of the witnesses by whom the defendant proposes to establish alibi." *Id.* "If a defendant . . . fails to comply with the requirements of this section, the court *may* exclude evidence offered to establish . . . alibi." *Id.* § 77-14-2(3) (emphasis added); *see also State v. Ortiz*, 712 P.2d 218, 219 (Utah 1985) (noting that section 77-14-2(3) "grants a trial court discretion to *exclude* evidence if the ten-day notice requirement is not met").

---

3. Because there have been no substantive changes to the relevant code section since Gilling's trial, we cite the current code for the convenience of the reader.

A.    Abuse of Discretion

¶39    Gilling asserts the trial court abused its discretion because section 77-14-2 provides that the court "may" exclude witnesses after a late notice and thus does not require the court to exclude the witnesses. We agree with Gilling's assertion that nothing in the statute requires the trial court to exclude alibi evidence after a late notice. But just as the statute does not require the court to exclude alibi evidence, it also does not require the court to admit the evidence. If the court chooses to exclude such evidence, it may do so as long as it appropriately considered "the avoidance of unfair surprise or prejudice to either party." *Ortiz*, 712 P.2d at 220. Based on the record before us, the trial court did just that.

¶40    The Alibi Notice provided six witnesses along with their names and contact information.[4] But, as the State explained and the court ultimately agreed, the Alibi Notice did not provide Gilling's locations, as required by the statute. *See* Utah Code § 77-14-2(1). Without this information, the State did not believe it had "the ability to do all [the] independent research within a couple of days and . . . be prepared to cross-examine all of [the] witnesses" given Gilling's untimely filing.

¶41    Gilling repeats on appeal his argument that because the Alibi Notice was due on a Friday and Gilling filed it on Sunday, "the State did not lose any business days or otherwise meaningful preparation time." But the statute does not draw a distinction between business days and non-business days. *See id.* Given that Gilling missed the ten-day deadline to file the Alibi Notice, the State lost nearly two days of investigation, which could have been crucial because the State would have had to track down each of

---

4. On appeal, Gilling challenges the exclusion of only one alibi witness. But in order to evaluate whether the trial court abused its discretion, we must examine the Alibi Notice that was presented to the trial court, which contained six witnesses.

the witnesses and learn how they specifically fit into Gilling's alibi before preparing to cross-examine them.

¶42   Gilling further claims that it was "overly harsh" for the trial court to decline to continue the trial in lieu of excluding Gilling's alibi witnesses. But the trial court explained why, in addition to Gilling's untimely and unspecific notice, it was declining a continuance. The trial was scheduled to occur in April 2023, and the continuance would have pushed the case "out till probably November." It was therefore well within the trial court's discretion to exclude Gilling's alibi witnesses and decline to continue the trial.

B.   Ineffective Assistance

¶43   In the alternative, Gilling argues that he received ineffective assistance when Counsel filed the Alibi Notice two days late. "Counsel should be strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment and . . . the burden to show that counsel's performance was deficient rests squarely on the defendant." *Burt v. Titlow*, 571 U.S. 12, 22–23 (2013) (cleaned up). Appellate courts thus give "trial counsel wide latitude in making tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." *State v. Wilkes*, 2020 UT App 175, ¶ 24, 479 P.3d 1142 (cleaned up). We therefore ask "whether the strategy [c]ounsel employed was that of a reasonable, competent lawyer in the real-time context" of trial. *Id.* "And even where a court cannot conceive of a sound strategic reason for counsel's challenged conduct, it does not automatically follow that counsel was deficient. The ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *Id.* (cleaned up).

¶44   To overcome this strong presumption that Counsel did not perform deficiently in failing to timely file the Alibi Notice,

Gilling must show that Counsel's actions were objectively unreasonable. Here, Counsel explained twice that "[p]art of the reason in the delay" in filing the Alibi Notice was that Counsel was unsure what days to obtain alibi witnesses for. Counsel then noted again that the lack of clarity in which days the defense needed to find witnesses for "was a factor" in the delayed filing. But Counsel did not elaborate on the record as to what the other reasons or factors were that influenced the timing of filing the Alibi Notice. Thus, we do not know the full context of why Counsel filed the Alibi Notice after the deadline.

¶45 Gilling seeks to remedy this issue by filing a motion under rule 23B of the Utah Rules of Appellate Procedure. This rule allows a party in a criminal case to move the appellate court "to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a). The motion is "available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *Id.*

¶46 But Gilling's rule 23B motion does not answer the question of *why* Counsel filed the Alibi Notice late, which is crucial to determining whether Counsel was ineffective. It only asserts that one of Gilling's alibi witnesses would have testified that during the time of the sexual assaults, Gilling was providing the witness "full-time medical care" following a car accident she was in, including "changing [her] diaper, showering, making [her] meals, and helping [her] adjust to [her] life after the accident." Even with this proffer, we still would have no basis for concluding that Counsel's performance was objectively unreasonable because the record shows that there were other "part[s]" and "factor[s]" that

caused Counsel to file the Alibi Notice late, and Gilling has not proffered any explanation for what those other reasons were.[5]

¶47 As the United States Supreme Court made clear in *Burt v. Titlow*, 571 U.S. 12 (2013), "the absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Id.* at 23 (cleaned up). Because we must "strongly presume[]" that Counsel rendered adequate assistance, *see id.* at 22–23 (cleaned up), and because we are lacking information as to the other "part[s] of the reason" why Counsel filed the Alibi Notice late, we cannot conclude that Counsel provided less than constitutionally effective assistance.

CONCLUSION

¶48 The trial court did not abuse its discretion when it ruled that Counsel opened the door to Expert's testimony or excluded Gilling's alibi witnesses for failing to timely file the Alibi Notice. Nor was Counsel ineffective for opening the door to Expert's testimony or for acknowledging as much, or for filing the Alibi Notice late. And, as Gilling's rule 23B motion was insufficient, we deny that as well. Accordingly, we affirm Gilling's convictions.

───────────

5. We recognize that this creates a challenge for defendants to anticipate and respond to gaps in the evidence when making an ineffectiveness of assistance claim on appeal. But the burden lies with the defendant to demonstrate that counsel's performance was objectively unreasonable considering all the circumstances. *See State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350. And the circumstances here show that Counsel had multiple reasons for the late filing, but Gilling's motion fails to address the other "part[s] of the reason in the delay." Without additional information, we are unable to conclude that Counsel's actions constituted deficient performance.